IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY; EMPOWER RETIREMENT, LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>EMPOWER GEOGRAPHICS, INC.; ALEX MACHINIS,<br><br>    Defendants. | Case No.: 1:21-cv-04004<br><br>Hon. John Robert Blakey |

**DEFENDANTS' MOTION TO DISMISS**

**I. PRELIMINARY STATEMENT**

Defendants Empower Geographics, Inc., and Alex Machinis (collectively, "Defendants" or "Empower"), move to dismiss Count I and II of Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) because they are not plausible on their face.

The defendants in this case have continuously owned the domain name <empower.com> since 2002. In 2014, twelve years after the defendants had been using the domain, the Great-West insurance company decided it wanted to re-brand some of its businesses using the word "empower." The executives at Great-West made this decision despite knowing three things: (1) the empower.com domain was registered to a duly-formed and senior corporation by that name; (2) the word "empower" is a non-exclusive dictionary word; and (3) as a consequence of the wide-spread use of the word, any trademark using the word "empower" would be, in Great-West's own words to the Patent and Trademark Office "inherently weak."

1

Moving forward with an inherently weak brand and knowing that the senior Empower.com was registered to Defendants, Great-West has tried to purchase the domain name from its legitimate owners since 2016. While the complaint goes to great length to describe the hundreds of millions Great-West has spent on its junior branding efforts, it does not disclose the pittance they were willing to pay for the domain. Great-West does not object to the lawfully-named Empower Geographics Inc. using "Empower" for years prior to its junior decision, and Great-West does not object to Defendants offering for sale a business asset which was legitimately registered, used and maintained in the course of business for many years. Instead, the Plaintiff is upset that "Defendants have refused to entertain reasonable offers" (Compl., ¶ 47) or the unknown figure which Plaintiff deems a "fair value" (Compl., ¶ 49). The Plaintiff asks this Court to establish a "reasonable" or "fair" price which the Defendants should be required by law to accept, and beyond which the Defendants should be deemed cybersquatters. Great-West initiated this Action as a cynical tactic in an obvious attempt to drive down the price of an asset it covets. At its core, Great-West's action is fundamentally an abuse of process seeking to leverage a junior trademark interest to hijack a senior business asset of the Defendants - namely, a valuable dictionary-word domain name which is obviously used in a variety of commercial contexts and is susceptible of legitimate further use by numerous parties who may be, and have been, interested in acquiring it.

Great-West's complaint suffers from numerous fatal admissions and legal failings that cannot be fixed by amendment. First, Great-West's cybersquatting claim must be dismissed because Great-West did not start to use a brand comprising the word "empower" until two decades after empower.com was registered, including over twelve years by Defendants. As a consequence, Great-West cannot show, as required by 15 U.S.C. § 1125(d)(A)(ii)(I), that it owns

a mark that is "distinctive at the time of the registration of the domain name." Great-West's only other claim under federal law under 15 U.S.C. § 1125(a) requires misleading use in commerce of the mark "on or in connection with any goods or services, or any container for goods". The Complaint admits, however, that the Defendants use of the domain name is neither related to the Plaintiff's goods and service and that Defendants use of the domain name is not a use in connection with any goods or services, or any container for goods.

## II. ARGUMENT

### A. Legal Standard

Under Rule 12(b)(6), the complaint must present "enough facts to state a claim to relief that is plausible on its face". *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[T]he plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself could these things have happened. . . ." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the *reasonable inference* that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added). Courts deciding a motion to dismiss "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

### B. Plaintiff Cannot Plausibly Allege Cybersquatting

The Anticybersquatting Consumer Protection Act ("ACPA") was enacted "in 1999 to combat the deliberate, bad-faith, and abusive registration of Internet domain names in violation of the rights of trademark owners, a practice also known as cybersquatting." *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 913-14 (N.D. Ill. 2007) (quotation marks omitted). The ACPA established a

cause of action for cybersquatting, codified as 15 U.S.C. § 1125(d), which plainly requires a claimant to show the domain name satisfies at least one of three conditions:

> (I) **in the case of a mark that is distinctive at the time of registration of the domain name**, is identical or confusingly similar to that mark;
>
> (II) **in the case of a famous mark that is famous at the time of registration of the domain name**, is identical or confusingly similar to or dilutive of that mark; or
>
> (III) is a trademark, word, or name protected by reason of [specific statutory protections of Red Cross and Olympic marks]

15 U.S.C. § 1125(d)(1)(A)(ii)(II)-(III) (emphasis added). The obvious point of requiring the subject mark to be distinctive or famous "at the time of registration of the domain name", is to embody the basic principle of priority by preventing junior trademark claimants from engaging in a predatory strategy of targeting domain registrants to use the ACPA to appropriate valuable dictionary-word domain names from established senior owners.

The Complaint alleges that the Empower.com domain name has continuously been registered to Defendant Empower Geographics and its sole officer Alex Machinis since 2002. Complainant admits "Defendant Empower Geographics, Inc. is an Illinois corporation duly organized and existing under the laws of the State of Illinois" whose "president and secretary ... is identified as Defendant Alex Machinis." (Compl., ¶ 6) "**[S]ometime between July 1994 and March 2002, the Empower Domain was transferred to Defendants, and thereafter has reflected Defendant Empower Geo and/or Defendant Machinis as the registrant of the Empower Domain**." (Compl., ¶ 37) (emphasis added). The Complaint does not allege that anyone other than Empower registered, continuously maintained and used the domain name since acquiring it in 2002 for use in Empower's legitimate software business.

The Complaint admits, **more than a dozen years after Empower acquired the domain name** that, "[i]n 2014, Great-West combined three financial service businesses to form a new

4

retirement business" (Compl., ¶ 15) for which Great-West launched and acquired several US trademark registrations consisting of the word "EMPOWER" accompanied by various logos and other words. (Compl., ¶ 18). At no time prior to this attempt to grab a senior domain name has Great-West claimed or registered rights in the word "EMPOWER" standing alone.

The Complaint concedes that the domain name was registered by Empower in 2002, has been continuously held by Empower since that time without interruption, and further concedes that Great-West had no trademark, famous or otherwise, at the time the domain name was registered by Defendants. Under the plain language of the statute, the Complaint must fail, and there is no plausible amendment under which Great-West can allege that 2014 preceded 2002.

In an attempt to avoid common sense application of the plain wording of the statute, the Complaint engages in pettifoggery in relation to ministerial updates and regular maintenance payments for the domain name. (Compl., ¶¶ 39-40). In each instance of administrative or regular maintenance updates, the Complaint admits and alleges that Empower was solely in control of these administrative modifications, and that Empower has retained beneficial ownership of the registration since 2002. (Compl., ¶ 39) ("**Defendants** periodically made changes to the Empower Domain registration") (emphasis added); (Compl., ¶ 40) ("**Defendants** again made numerous changes to the registration") (emphasis added). Quite obviously, absent sole, continuous and exclusive ownership and control of the domain registration, Empower could not make the administrative changes that the Complainant admits Empower to have made.

The only Circuit Court decisions which have directly addressed issues relating to the timing of domain registration for the purposes of the ACPA have been *Schmidheiny v. Weber*, 319 F.3d 58 (3d Cir. 2003), and *GoPets Ltd. v. Hise*, 657 F.3d 1024 (9th Cir. 2011). Both of these cases involved an original registration of a domain name to a first named registrant, and

5

then a transfer of that domain name to a legally-distinct and different registrant at a later time. However, the animating purpose of the inquiry in both cases is distinct. *Schmidheiny* addresses the question of whether the ACPA applies to domain names which were created prior to the effective date of the ACPA itself, and is not addressed to the priority condition of § 1125(d). *GoPets*, on the other hand, does address the issue of domain/trademark priority.

*GoPets* addressed the question of whether a domain name created senior to a trademark, but transferred to a related party after registration of the trademark, was deemed "registered" before or after the trademark issued under the priority condition of the ACPA. The defendant Hise registered a disputed domain name originally and senior to the mark at issue. 657 F.3d at 1026. After the mark was registered, and after a dispute over the domain name arose, Hise transferred the domain name to a corporation controlled by him and his brother. *Id.* at 1028. Considering the ACPA requirement that the mark be "distinctive at the time the domain name was registered", and considering the change of registrant in the meantime since original domain registration, the *GoPets* court found:

> Looking at ACPA in light of traditional property law, however, we conclude that Congress meant "registration" to refer only to the initial registration. It is undisputed that Edward Hise could have retained all of his rights to gopets.com indefinitely if he had maintained the registration of the domain name in his own name. We see no basis in ACPA to conclude that a right that belongs to an initial registrant of a currently registered domain name is lost when that name is transferred to another owner.

*Id. at* 1031. Here, the circumstances are more direct than in *GoPets*, as the Complaint admits that Empower has been the sole owner and controller of the domain name for years prior to the alleged mark. Furthermore, the Complaint admits Empower Geographics Inc. and its sole officer Alex Machinis on behalf of Empower Geographics Inc. have exclusively controlled the domain name throughout various minor, nominal changes in the registration, and there has been no substantive change of beneficial ownership of the registration. As recently explained in

*Prudential Ins. Co. of Am. v. PRU.COM*, No. 1:20-cv-450, 2021 WL 2744526, at *11 (E.D. Va. June 30, 2021):

> On these facts [of the Hise case], the Ninth Circuit sensibly concluded that Hise was not a cybersquatter, given the minor, nominal change in ownership. Hise effectively controlled the subject website both before and after the change in the registration, and that clearly was what mattered. [...] Clearly, a person who simply re-registers a domain name due to a periodic re-registration requirement does not act with a bad faith intent to profit in doing so. Such a situation is quite different from the facts of this case, where an unrelated third party purchased the domain name.

In contrast to the basis for the timing inquiry in *GoPets*, the inquiry in *Schmidheiny* addressed the question of timing of registration for the purpose of deciding whether ACPA was applicable to any domain name originally registered - by anyone - prior to passage of the ACPA in 1999. The operative facts therein are recited as follows:

> [T]he domain name was initially registered by Steven Weber personally on February 28, 1999, before the Act took effect on November 29, 1999. Because we conclude that a subsequent registration by Famology.com, Inc. in June 2000 is an action **within the purview of the Anti-cybersquatting Act**, we will reverse.

319 F.3d at 581 (emphasis added). Because the "original" registration was to a "Steven Weber" but the domain name was later registered to a "Famology.com, Inc." the court concluded that the later registrant of the domain name after the intervening passage of the ACPA was not entitled to rely on the original registrant's registration date of the domain name to avoid application of the ACPA claim, concluding:

> We hold that the word "registration" includes a new contract at a different registrar and to a different registrant. In this case, with respect to Famology.com — that occurs after the effective date of the Anti-cybersquatting Act.
>
> To conclude otherwise would permit the domain names of living persons to be sold and purchased without the living persons' consent, ad infinitum, so long as the name was first registered before the effective date of the Act."

*Id.* at 583. The court in *Schmidheiny* was merely addressing what would otherwise be an all-purpose loophole in relation to domain names registered prior to the 1999 effective date of the

7

ACPA itself. It did not address the question of priority between the domain registration and the trademark under 15 U.S.C. § 1125(d)(1)(A)(ii)(II)-(III). Indeed, under the operative language of *Schmidheiny*, the court did not actually define "registration" but merely found that it " 'includes' a new contract" with a new registrant after the effective date of the ACPA, in order to apply the ACPA. *Id.* at 583. *Schmidheiny* has nothing to say about the priority condition embodied in 15 U.S.C. § 1125(d)(1)(A)(ii)(II)-(III), because domain/trademark priority was simply not an issue in that case. Likewise, in another inapposite circuit decision address a claim of senior domain registration rights, *Linen v. Dutta-Roy*, 810 F.3d 767, 772 (11th Cir. 2015), the circumstances involved an intervening actual expiration, deletion, and literal re-registration of a domain name, and is thus not applicable to the facts here of continuous ownership of a domain name through ordinary administrative updates and renewals. Quite obviously, if one lost senior rights and goodwill in the use of a domain name merely due to the required periodic payments or administrative updates required to maintain a domain name, utter chaos would ensue if, for example, Google were to be deemed to have surrendered its senior rights and goodwill in the domain Google.com merely because a domain renewal fee was paid.

Under the "expiration of rights upon maintenance payment" view of the ACPA, any covetous junior trademark claimant would simply need to wait until a renewal or minor ministerial update were made to a desired domain name, and then be entitled to the domain name under the ACPA. The ACPA cannot have been intended merely to replace one intentionally predatory behavior with another. It defies common sense to conclude that paying the perfunctory registration dues of a domain name corresponding to one's own legitimate business name, updating one's address, or identifying oneself as the sole officer of a corporation in connection with a registration, somehow becomes a "bad faith" act merely because some junior

8

party has obtained a trademark registration in connection with unrelated goods or services. It further defies common sense to conclude that the ACPA prevents a business from divesting itself of its legitimately acquired and owned business assets on whatever terms the owner finds reasonable. The domain name here at issue was (a) acquired by Defendants after passage of the ACPA (unlike *Schmidheiny*) (b) registered and used long prior to Plaintiff's alleged mark (unlike *GoPets*) (c) undisputedly corresponds to the legitimate business name and mark of the Defendants, and (d) consists of a highly valuable dictionary word domain name that might legitimately be of interest to numerous mutually unrelated and non-infringing purchasers.

The Defendant submits there is a definite reason for an absence of circuit court decisions addressing the question of whether a domain name which was originally registered senior to a trademark claim may continue to be maintained by the original registrant absent transfer thereof, and it is an exceeding simple reason. There is no ambiguity in the plain language of the ACPA requiring a "mark that is distinctive at the time of registration of the domain name". Contentious issues have arisen in circumstances of subsequent transfers of a domain name among different parties or claims that pre-1999 domain names are exempt from the ACPA. However, the ACPA has apparently been sufficient to deter fundamentally meritless ACPA claims based on clearly junior trademark allegations, and unbroken ownership of the domain name senior to the alleged mark, such as the instant action.

The Complaint is refreshingly honest about what is driving this Proceeding. Great-West it has been trying to buy the domain name for years, and is unhappy that Empower has not agreed to accept what they are offering (*e.g.*, (Compl., ¶ 47)), and that Empower should accept whatever Great-West deems "reasonable" or "fair". Great-West does not object to the Defendants having run a company named "Empower" for more than a decade before Great-

9

West's sole decision to launch an "EMPOWER" brand. Great-West admits its predicament of coveting what it does not have and which belongs to someone else is a circumstance solely of Great-West's own deliberate making. Great-West does not object to buying a dictionary-word domain name at whatever it deems "fair market value". However, the value of dictionary-word domain names easily runs into millions of dollars as noted in *Interstellar Starship Services, Ltd. v. Epix, Inc.*, 304 F.3d 936, 942 n.5 (9th Cir. 2002) ("The price tags on other well-recognized domain names are astounding. Reports indicate that sex.com retailed for $250 million, business.com for $7.5 million, broadband.com for $6 million, loans.com for $3 million, and flu.com for $1.4 million.").

This Action is simply premised on Great-West's belief that the Defendants have a legal obligation to accept Great-West's price, and this action is merely a bully tactic to take from the Defendant what the Plaintiff could not purchase. The Plaintiff is no more entitled by law to the transfer of this domain name than the Plaintiff was entitled to put its logo on a Denver football stadium (Compl., ¶ 30) without paying the owner of that stadium for the privilege. The Denver stadium was there first, and so the Plaintiff had to pay the owner to use it instead of building its own stadium. Likewise, in view of the Defendant's priority discussed above, and in further view of the admitted relative lack of distinctiveness and narrow scope of the Plaintiff's mark, discussed in detail below, the complaint fails to state a plausible claim under § 1125(d).

### C. Plaintiff Cannot Plausibly Allege Trademark Infringement

Likely aware of the fatal flaw in its ACPA allegation, the Complaint is shored up by a less-impressive "trademark infringement" claim purportedly under 15 U.S.C. § 1125(a). As noted above, the Complaint admits the domain name has been duly registered by a lawfully-named "Empower Geographics Inc." and its principal for twelve years senior, and pretends that a

senior business with established goodwill cannot dispose of its used business assets on terms it finds agreeable. For those reasons, the Complaint does not plausibly allege that the Defendants are engaged in the provision of infringing goods and services. A claim of false designation of origin under 15 U.S.C. § 1125(a) can only be made against:

> (1) **Any person who, on or in connection with any goods or services, or any container for goods**, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, [...]

In contrast, the Complaint urges that the domain name is not used to indicate the source or origin of **any** goods or services, and alleges, at paragraph 65,

> Starting in 2016, Defendants ceased using the Empower Domain to host any business-related information and stopped using the Empower Domain in connection with even an arguable *bona fide* offering of goods or services, and it became solely a landing page reflecting a 'For Sale' sign.

Great-West concedes that there is not "even an arguable bona fide offering of goods or services" being conducted via the domain name, and in so doing admits the Complaint fails to allege that Defendants use the alleged mark "on or in connection with any goods or services, or any container for goods" as § 1125(a)(1) requires.

Here, the Complaint conflates what is relevant "confusion" for the purpose of trademark infringement. Citing the possibility that persons may mis-address emails (Compl., ¶ 48), the Plaintiff fails to acknowledge who is responsible for those circumstances. It is simply not possible for the Defendants to have predicted, upon acquiring the domain name in 2002, what precipitously unwise decisions the Plaintiff would make in 2014. The fact that the Plaintiff chose to use "EMPOWER" in its branding in 2014, and was somehow ignorant that

11

empower.com was registered to Defendants at that time, defies reasonable belief. Any resulting "confusion", albeit not relevant to the type of confusion addressed in 1125(a), is solely a consequence of the Plaintiff's unilateral decision to proceed in light of the facts known to the Plaintiff at the time it chose to appropriate the Defendants' senior mark.

Furthermore, Great-West alleges to be the "second-largest provider of retirement services" (Compl., ¶ 37) and claims that it has a well-established reputation in that field, such that it would not be likely to mistake a provider of retirement services with a "domain for sale" page. Inherent in this claim is an implicit assertion by the Plaintiff that any other party which uses the word "empower" for any purpose is necessarily implicating the Plaintiff's limited trademark rights. It is a "fundamental error" to "suppose[] that a trade-mark right is a right in gross or at large, like a statutory copyright or a patent for an invention. . . . There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed" *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918); *accord Specht v. Google Inc.*, 758 F. Supp. 2d 570, 591 (N.D. Ill. 2010). "The mere fact that one person has adopted and used a trade-mark on his goods does not prevent the adoption and use of the same trade-mark by others on articles of a different description" *American Steel Foundries v. Robertson*, 269 U.S. 372, 380 (1926).

Inherent in Great-West's expansive assertion of rights under § 1125(d) and § 1125(a) conferred by its junior federal trademark registrations are the circumstances under which those registrations were obtained. As noted in *Slep-Tone Entm't Corp. v. Teddy O'Brian's, Inc.*, No. 14 C 3570, 2014 WL 4783048, at *2 (N.D. Ill. Sept. 24, 2014):

> Normally, the Court cannot consider matters outside of the complaint on a Rule 12(b)(6) motion to dismiss unless it converts the motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d). There is an exception, however, for matters of public record like trademark applications.

The Plaintiff's sole trademark registration which does not combine "EMPOWER" with other verbiage is the subject mark of US TM Reg. No. 5,407,837, which issued in 2018—*i.e.*, 16 years junior to the Defendants' establishment of Empower Geographics Inc. at Empower.com:



Addressing the USPTO's refusal to register the mark in view of numerous other trademark registrations for financial services incorporating the word "EMPOWER", the Plaintiff advanced two principal arguments: (1) that the graphical image is essential to the mark; and (2) that marks incorporating "EMPOWER" are "weak marks".  Specifically, in response to refusal of its application, Plaintiff argued in a response to the USPTO dated August 21, 2015:

> [A]pplicant's mark contains **a strong design element, namely, vivid, red, flag-like wavy lines** that immediately call to mind the qualities of strength, stability, character and security.  This power graphical element is centered directly above and given **at least, if not more, prominence than the word EMPOWER**, which appears in blue below.  **The design element and the literal element cannot be separated or distinguished as separate elements**, as might be the case if the design element were to the left or right of the literal element.

Exhibit A at 18 (Response to Office Action, U.S. Trademark Application Serial No. 86/435,969, at 4 (Aug. 21, 2015), https://tsdr.uspto.gov (enter Reg. No. 5407837 and select "Documents" button; then select Aug. 21, 2015 docket entry; then select linked PDF of Applicant's argument titled "EMPOWER_RESPONSE.pdf")) (emphasis added). For the purpose of obtaining trademark registration over other "EMPOWER" marks for financial services, the Plaintiff claims the design element of its mark is "inseparable" from the mark as a whole; but for the purpose of claiming confusing similarity with a domain name under 1125(a) or 1125(d), the Plaintiff sings a radically different tune.

      The Plaintiff also pointed out, in view of 25 other US federal registrations for financial services containing "EMPOWER" or variants thereof (*see* Exhibit A at 20-22 (Resp. at 6-9)),

> [R]elevant consumers will look to applicant's strong graphical element and overall commercial impression of its mark to differentiate applicant's services . . . The record is clear that [t]he USPTO, by allowing or granting registration to all of these EMPOWER-formative and phonetic equivalent marks, has determined that these marks are inherently weak . . .

*Id.* at 27 (Resp. at 13). Thus, the Plaintiff joined the ranks of owners of "inherently weak" US trademark registrations containing "EMPOWER" in the field of commercial services—any of whom may be legitimately interested in obtaining the domain name, and any of whose customers may misdirect emails. Even more broadly, since the Defendants' have offered the domain name for general sale to any interested party, the public record of the USPTO shows that there are some 66 pending and registered US trademark applications in which the literal element consists solely of "EMPOWER", and 784 pending and registered US trademark applications comprising the word "EMPOWER". *See* Exhibit B, Chandra Decl. The Plaintiff's admissions in obtaining its trademark registration, and the public record, amply demonstrate that the word "EMPOWER" is principally a dictionary word which is non-exclusively used in wide variety of commercial contexts, by a wide variety of parties, any of whom may be interested in purchasing the domain name from the Defendants on the basis of the "For sale" page stating its availability. *Interstellar Starship Services, Ltd. v. Epix, Inc.,* 304 F.3d 936, 942 (9th Cir. 2002) ("In the end, however, this dispute arises because while many brick and mortar companies can peacefully coexist using the EPIX mark, there can be only one owner and user of www.epix.com.")

      For the foregoing reasons, the Defendants submit that the Plaintiff has not made out a claim under 15 U.S.C. § 1125(a), as the Plaintiff denies the Defendants are engaged in the sale of any goods or services, and the Plaintiff has denied that its rights extend to a broad proprietary interest in the dictionary word "EMPOWER" by itself.

14

Dated:  September 10, 2021

Respectfully submitted,

/s/ David P. Berten
David P. Berten (IL #6200898)
Global IP Law Group, LLC
55 W. Monroe St, Ste 3400
Chicago, IL 60603
Tel.: 312-241-1500
dberten@giplg.com

John Berryhill, Ph.d. Esq. (*pro hac vice* forthcoming)
204 East Chester Pike
First Floor, Suite 3
Ridley Park, PA 19078
Tel.: 610-565-5601
john@johnberryhill.com

*Attorneys for Defendants Empower Geographics, Inc. and Alex Machinis*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will notify all attorneys of record of the filing of this document.

*/s/ David P. Berten*
David P. Berten
