**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Great-West Life & Annuity Insurance Company,
and Empower Retirement, LLC,

                  Plaintiffs,

      vs.

Empower Geographics, Inc., and Alex Machinis,

                Defendants.

Case No. 1:21-cv-04004

**JURY TRIAL DEMANDED**

Hon. John Robert Blakey

<u>**PLAINTIFFS GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY'S AND
EMPOWER RETIREMENT, LLC'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS**</u>

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ....................................................................................... 1

II.     STATEMENT OF RELEVANT FACTS .................................................... 2

        A.      Plaintiffs Developed Distinctive Marks.......................................... 2

        B.      Defendants Abandoned Any Legitimate Interest in the Empower
                Domain to Capitalize on Plaintiffs' EMPOWER Brand ................. 3

III.    LEGAL STANDARD................................................................................ 4

IV.     ARGUMENT............................................................................................. 4

        A.      Plaintiffs State a Claim under the ACPA........................................ 4

                i.      Defendants' Continued Use and Registration of the
                        Domain is in Bad Faith ........................................................ 5

                ii.     ACPA Claims Are Not Limited to Initial Registrations..... 6

                iii.    The EMPOWER Marks were Distinctive at all Relevant
                        Times .................................................................................... 8

                iv.     *GoPets* is a Decision on Appeal from *Summary Judgment*,
                        is Not Widely Followed, and is Distinguishable from This
                        Case ...................................................................................... 9

        B.      Plaintiffs State a Claim for Trademark Infringement ................... 12

                i.      Plaintiffs Own Distinctive Marks ..................................... 12

                ii.     Defendants Are Not Senior Users...................................... 12

                iii.    Defendants Use the EMPOWER Marks ............................ 13

                iv.     Defendants' Use of the Empower Domain Causes
                        Confusion............................................................................ 14

V.      CONCLUSION........................................................................................ 15

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ABN AMRO, Inc. v. Cap. Int'l Ltd.*,
595 F. Supp. 2d 805 (N.D. Ill. 2008) ..................................................................4

*Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co.*
LLC, 2017 WL 3528606 (D. Del. Aug. 16, 2017)...............................6, 7, 8, 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................4

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................................................4

*CAE, Inc. v. Clean Air Eng'g, Inc.*,
267 F.3d 660 (7th Cir. 2001) ........................................................................14, 15

*Charisma Brands, LLC v. AMDL Collections, Inc.*,
2019 WL 6331399 (C.D. Cal. Sept. 3, 2019) ...............................................9, 12

*Davis v. Lost Intl. LLC*,
2013 WL 12137103 (C.D. Cal. Apr. 8, 2013) ..............................................9, 12

*Deckers Outdoor Corp. v. Does 1-100*,
2013 WL 169998 (N.D. Ill. Jan. 16, 2013) .........................................................5

*Euromarket Designs, Inc. v. Crate & Barrel Ltd.*,
96 F. Supp. 2d 824 (N.D. Ill. 2000) ..................................................................14

*Facebook, Inc. v. Teachbook.com LLC*,
819 F. Supp. 2d 764 (N.D. Ill. 2011) ...........................................................9, 12

*FieldTurf, Inc. v. Triexe Mgmt. Grp., Inc.*,
2003 WL 22956000 (N.D. Ill. Dec. 11, 2003) ..................................................13

*Flentye v. Kathrein*,
485 F. Supp. 2d 903 (N.D. Ill. 2007) ..................................................................5

*Georgia-Pacific Consumer Products LP v. Kimberly-Clark Corp.*,
647 F.3d 723 (7th Cir. 2011) ...............................................................................8

*GoPets Ltd. v. Hise*,
657 F.3d 1024 (9th Cir. 2011) ...............................................................9, 10, 11

*Heron Dev. Corp. v. Vacation Tours, Inc.*,
    2017 WL 2895921 (S.D. Fla. Apr. 13, 2017) ...................................................... 6

*Intermatic Inc. v. Toeppen*,
    947 F. Supp. 1227 (N.D. Ill. 1996) ...................................................... 14

*Interstellar Starship Servs., Ltd. v. Epix, Inc.*,
    304 F.3d 936 (9th Cir. 2002) ...................................................... 5

*Jysk Bed'n Linen v. Dutta-Roy*,
    810 F.3d 767 (11th Cir. 2015) ...................................................... 6, 7, 10, 11

*Lahoti v. VeriCheck, Inc.*,
    586 F.3d 1190 (9th Cir. 2009) ...................................................... 12

*Mackie v. Awtry*,
    2016 WL 5391182 (N.D. Ill. Sept. 27, 2016) ...................................................... 9, 12

*Manistee Apartments, LLC v. City of Chicago*,
    844 F.3d 630 (7th Cir. 2016) ...................................................... 4

*Mehdiyev v. Qatar Natl. Tourism Council*,
    2021 WL 1291143 (D. Colo. Apr. 1, 2021) ...................................................... 10

*Ownum, LLC v. Ownum, Inc.*,
    2020 WL 8882941 (D. Del. Apr. 17, 2020) ...................................................... 6

*People for the Ethical Treatment of Animals v. Doughney*,
    263 F.3d 359 (4th Cir. 2001) ...................................................... 13-14

*Prudential Ins. Co. of Am. v. PRU.COM*,
    2021 WL 2744526 (E.D. Va. June 30, 2021) ...................................................... 6, 10, 11

*Ricks v. BMEzine.com, LLC*,
    727 F. Supp. 2d 936 (D. Nev. 2010) ...................................................... 7

*S. Grouts & Mortars, Inc. v. 3M Co.*,
    2008 WL 11333151 (S.D. Fla. Apr. 29, 2008) ...................................................... 6

*Schmidheiny v. Weber*,
    319 F.3d 581 (3d Cir. 2003) ...................................................... 6, 10

*Slep-Tone Ent. Corp. v. Coyne*,
    41 F. Supp. 3d 707 (N.D. Ill. 2014) ...................................................... 13, 15

*Specht v. Google Inc.*,
    758 F. Supp. 2d 570 (N.D. Ill. 2010) ...................................................... 13

*Storey v. Cello Holdings, LLC*,
   347 F.3d 370 (2d Cir. 2003)................................................................................7, 10, 11

*Tory Burch LLC v. Does 1-100*,
   2012 WL 4581409 (N.D. Ill. Oct. 2, 2012)..........................................................6, 9

*Villareal v. Saenz*,
   2021 WL 1986831 (W.D. Tex. May 18, 2021) .........................................................10

*Vulcan Golf, LLC v. Google Inc.*,
   552 F. Supp. 2d 752 (N.D. Ill. 2008) ..............................................................9, 12, 13

*Xereas v. Heiss*,
   933 F. Supp. 2d 1 (D.D.C. 2013) ................................................................5, 6, 10, 11

**Statutes**

15 U.S.C. § 1125................................................................................................5, 11, 14

Plaintiffs Great-West Life & Annuity Insurance Company and Empower Retirement, LLC (collectively, "Plaintiffs") hereby respond to Defendants' Motion to Dismiss (Dkt. 21).

## I.      INTRODUCTION

This case is about how a seemingly legitimate use of a website can become cybersquatting. In or around 2014, just after Plaintiffs launched a nationwide campaign to introduce every household in America to their EMPOWER Brand and EMPOWER Marks, Defendants abandoned any legitimate use of the Empower Domain, and began a years-long campaign to create confusion and profit from the Empower Domain's association with the EMPOWER Brand and EMPOWER Marks. This kind of abuse is precisely what Congress intended to address through the Anti-Cybersquatting Consumer Protection Act ("ACPA").

Defendants argue the ACPA should not apply to them because their original registration allegedly was in good faith and predates Plaintiffs' rights, but this argument ignores that Defendants abandoned their original use and continued to renew and use the Empower Domain well after the development of Plaintiffs' distinctive trademark rights. That is cybersquatting, and the ACPA provides a remedy. A vast majority of courts have rejected Defendants' argument that the ACPA is limited to the facts at the point of initial registration. Rather, it creates an ongoing obligation to act in good faith. Plaintiffs' allegations, which must be accepted as true at this stage of the case, are sufficient to establish that Defendants are acting with a bad faith intent to profit.

Defendants also argue they are not selling anything on the Empower Domain so the trademark infringement claim should be dismissed. This misses the point that Defendants are using the EMPOWER Marks to sell the Empower Domain itself. As Defendants have repeatedly admitted, this use has caused actual confusion. As alleged in the Complaint, Defendants boasted that they receive "phone calls every day" from Plaintiffs' customers "with 401k questions" and

receive "numerous emails on a regular basis" from Plaintiffs' business partners and customers who are attempting to reach Plaintiffs. Defendants have gone so far as to threaten to contact Plaintiffs' competitors that may be interested in using the Empower Domain and to "create some more confusion." That is the definition of trademark infringement, which is intended to protect consumers from precisely such confusion. Therefore, Defendants' motion to dismiss should be denied in its entirety.

## II.     STATEMENT OF RELEVANT FACTS

### A.     Plaintiffs Developed Distinctive Marks

In 2014, Plaintiffs launched a new retirement business under the brands of "Empower Retirement" and "Empower" ("EMPOWER Brand"). Dkt. 1 at ¶ 1. Through rapid growth and promotion, Plaintiffs quickly acquired millions of customers, for which they administer more than $1 trillion in assets, making them the second largest provider of retirement services in the United States. *Id.* at ¶¶ 15-16. The public recognizes Plaintiffs as the source of a broad family of EMPOWER trademarks (the "EMPOWER Marks"), some of which are recorded in several federal trademark registrations and pending applications. *Id.* at ¶¶ 18-20.

The EMPOWER Brand and the EMPOWER Marks have become well-known and nationally prominent. *Id.* at ¶¶ 23-24, 35. Annually, Plaintiffs have spent more than $50 million in the United States alone to promote and advertise the EMPOWER Brand. *Id.* at ¶ 17. These marketing efforts have included high-profile sponsorships with the Kansas City Chiefs, Denver Broncos and New England Patriots, as well as naming rights for several athletics facilities. *Id.* at ¶¶ 28 -30; *see also*, *id.* at ¶ 31 (also includes sponsorships of PGA and LPGA athletes). As a result, the EMPOWER Marks have been distinctive and identified a single source for Plaintiffs' products and services since at least 2016. *Id.* at ¶¶ 18, 24, 57, 65, 66.

### B. Defendants Abandoned Any Legitimate Interest in the Empower Domain to Capitalize on Plaintiffs' EMPOWER Brand

Before Plaintiffs launched the EMPOWER Brand, Defendants operated a business under the name "Empower Geo," and the Empower Domain was used for Empower Geo's website. Dkt. 1 at ¶¶ 36, 37. However, after Plaintiffs' nationwide introduction of the EMPOWER Brand, Defendants' use of the Empower Domain transformed. *Id.* at ¶ 42. As the EMPOWER Brand continued to become a household name, Defendants soon abandoned any legitimate use of the Empower Domain, removed all Empower Geo content from the webpage, and replaced it with the heading, "The Domain Empower.Com is For Sale." *Id.* ¶¶ at 42-44.

Since at least 2016, Defendants have continued to register and use the Empower Domain solely for the purposes of capitalizing on its similarity with the EMPOWER Brand and the EMPOWER Marks. *Id.* at ¶ 43. In an effort to extract a large payment from Plaintiffs, Defendants have engaged in a years-long scheme to profit from actual and potential customer confusion. *Id.* at ¶¶ 44-52. While privately telling Plaintiffs that they receive "phone calls every day" and "numerous emails on a regular basis" from Plaintiffs' customers, Defendants publicly marketed Empower Domain to competitor financial services and investment companies. *Id.* at ¶¶ 48, 50. On multiple occasions, Defendants flaunted the alleged interest of third parties in the Empower Domain, threatening imminent sales to parties that could cause further confusion if Plaintiffs did not comply with Defendants' demands. *Id.* at ¶¶ 47, 48. When Plaintiffs refused to be intimidated, Defendants became more brazen, publicly listing "Empower Retirement" as a target on the website found at the Empower Domain and engaging a domain brokerage firm to market the Empower Domain to "domain investors." *Id.* at ¶¶ 50, 51.

Through these actions, Defendants have demonstrated their only interest in the Empower Domain is to capitalize on Plaintiffs' goodwill and the value of the EMPOWER Brand. *Id.* at ¶ 49.

Rather than referencing any value in the Empower Domain generated by their own goodwill, Defendants have openly admitted that their demands are based on their perception of Plaintiffs' financial condition, the goodwill Plaintiffs have generated in the EMPOWER Brand, and the growth of Plaintiffs' business and assets under management. *Id.*

## III.  LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In deciding a motion to dismiss, the court should not weigh evidence or evaluate the merits of the claims. *ABN AMRO, Inc. v. Cap. Int'l Ltd.*, 595 F. Supp. 2d 805, 854 (N.D. Ill. 2008). Rather, the court accepts the well-pleaded factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Manistee Apartments, LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016). Dismissal is then only warranted if no recourse could be granted under any set of facts consistent with the allegations. *Twombly*, 550 U.S. at 563.

## IV.  ARGUMENT

### A.  Plaintiffs State a Claim under the ACPA

The ACPA does not confine itself to the circumstances of initial registration. Renewed registrations can give rise to causes of action. Defendants dispute the significance of those renewals, but those are factual issues that cannot be resolved on a motion to dismiss. Indeed, Defendants have not cited one case where a properly pleaded ACPA claim was adjudicated on a motion to dismiss. The Court should reject Defendants' invitation to ignore the purpose of the ACPA and to turn a blind eye toward well-plead allegations about their bad faith intent to profit

from the Empower Domain's association with Plaintiffs' distinctive EMPOWER Marks.

i.      **Defendants' Continued Use and Registration of the Domain is in Bad Faith**

A person engages in unlawful conduct under the ACPA if he (1) registers, uses, or traffics in a domain name that (2) is identical or confusingly similar to a distinctive mark, or is identical, confusingly similar to, or dilutive of a famous mark, (3) with a bad faith intent to profit from that mark. 15 U.S.C. § 1125(d)(1)(A). The statute's purpose is to eliminate the practice of cybersquatting. *Xereas v. Heiss*, 933 F. Supp. 2d 1, 16 (D.D.C. 2013). As the Senate report explained, "the abusive conduct that is made actionable is appropriately limited just to bad-faith registrations and uses of others' marks by persons who seek to profit unfairly from the goodwill associated therewith." S.Rep. No. 106–140 at *8 (1999), 1999 WL 594571. The ACPA sets forth factors to consider when determining bad faith. 15 U.S.C. § 1125(d)(1)(B)(i). These factors are not "an exclusive list." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946-47 (9th Cir. 2002). Rather, "the most important grounds for finding bad faith are the unique circumstances of the case, which do not fit neatly into the specific factors enumerated by Congress." *Id.* (quotation omitted). Among the considerations is whether the defendant offered to sell the domain name to the mark owner for financial gain without an intent to use it. 15 U.S.C. § 1125(d)(1)(B)(i)(VI).

Here, the Complaint expressly alleges that Defendants ceased using the Empower Domain for any bona fide purpose in 2016, and thereafter continued to use and renew or "re-register" the Empower Domain solely for the purposes of selling it at an inflated price derived from the similarity with Plaintiffs' valuable EMPOWER Brand and EMPOWER Marks. Dkt. 1 at ¶¶ 38-40, 42-45, 48-52. This is sufficient to satisfy the bad faith intent requirement. *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 915 (N.D. Ill. 2007) (holding that "Plaintiffs have easily satisfied this requirement by explicitly alleging that Defendants registered the domain names in bad faith"); *Deckers Outdoor*

*Corp. v. Does 1-100*, 2013 WL 169998, at *4 (N.D. Ill. Jan. 16, 2013) (where defendants "directly incorporate" the mark into the domain, such "facts manifest a bad-faith intent to profit from the [] mark"); *Tory Burch LLC v. Does 1-100*, 2012 WL 4581409, at *4 (N.D. Ill. Oct. 2, 2012) (same).

### ii.      ACPA Claims Are Not Limited to Initial Registrations

Plaintiffs can state a claim under the ACPA notwithstanding Defendants' alleged good faith when originally registering the Empower Domain or Plaintiffs' later development of the EMPOWER Brand and EMPOWER Marks. Numerous courts have recognized that the ACPA applies not only to initial registrations, but also to renewals. *See e.g.*, *Schmidheiny v. Weber*, 319 F.3d 581, 583 (3d Cir. 2003) ("the language of the statute does not limit the word 'registration' to the narrow concept of 'creation registration'"); *Jysk Bed'n Linen v. Dutta-Roy*, 810 F.3d 767, 777 (11th Cir. 2015) ("We agree with the Third Circuit. The Act does not define the term *register.* The Act nowhere contains the qualifications of *initial* or *creation* when it refers to the act of registering. It refers simply to a registration, and a re-registration is, by definition, a registration"); *Xereas*, 933 F. Supp. 2d at 15 ("By interpreting the term registration as applying to re-registrations, the scope of coverage extends to each registrant of a domain name rather than only the first registrant. This interpretation furthers the statute's purpose of eliminating cyber-squatting").[1]

---

[1] *See also S. Grouts & Mortars, Inc. v. 3M Co.*, 2008 WL 11333151, at *7-8 (S.D. Fla. Apr. 29, 2008) (denying motion to dismiss where complaint alleged the defendant "continues to traffic in the domain name inasmuch as it has renewed/re-registered the domain name"); *Prudential Ins. Co. of Am. v. PRU.COM*, 2021 WL 2744526, at *11 (E.D. Va. June 30, 2021) ("numerous courts have held that a 're-registration' is a 'registration' within the meaning of the ACPA"); *Ownum, LLC v. Ownum, Inc.*, 2020 WL 8882941, at *3 (D. Del. Apr. 17, 2020), *R&R adopted* 2020 WL 8884958 (D. Del. May 5, 2020) ("the term 'registration' includes circumstances where" the domain was re-registered); *Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co.* LLC, 2017 WL 3528606, at *13 (D. Del. Aug. 16, 2017) ("Counting any registration as registration for the purposes of the Act gives force to Congress's intent"); *Heron Dev. Corp. v. Vacation Tours, Inc.*, 2017 WL 2895921, at *14 (S.D. Fla. Apr. 13, 2017), *R&R adopted,* 2017 WL 2901203 (S.D. Fla. May 26, 2017) ("We accordingly will not read additional words into the statute such as initial or creation. The plain meaning of register includes a re-registration").

Thus, questions about a defendant's intent and the distinctiveness of a trademark are not frozen in time, but part of an ongoing factual inquiry. *See Am. Cruise Lines*, 2017 WL 3528606 at *13 (observing it was "Congress's intent to make 'rights to a domain-name registration contingent on ongoing conduct rather than to make them fixed at the time of registration.'" (quoting *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 385 (2d Cir. 2003))). To hold otherwise would undermine Congressional intent. *Ricks v. BMEzine.com, LLC*, 727 F. Supp. 2d 936, 954 (D. Nev. 2010). "If a domain name was registered in good faith originally, but thereafter re-registered in bad faith, the cybersquatter would escape liability, a result not supportable by the statutory scheme." *Id.*; *see also Am. Cruise Lines*, 2017 WL 3528606 at *13 ("Under Defendant's theory a party could use another's mark to its own benefit and in bad faith indefinitely so long as the first registration was legal. That result conflicts with the text and purpose of the statute.").

Plaintiffs' claims are not based on Defendants' original registration of the Empower Domain, but on the continued use, maintenance, and renewal of that registration since at least as early as 2016, at which time Plaintiffs' EMPOWER Marks were distinctive and Defendants had a bad faith intent to profit from the Empower Domain's association with the EMPOWER Marks. The domain registration activity that Defendants characterize as "ministerial updates and regular maintenance payments" or "ordinary administrative update and renewals" are, in fact, evidence of their continued use and registration of the Empower Domain after they had already abandoned any legitimate interest in it.[2] Dkt. 1 at ¶¶ 39-40. Any dispute about the factual inferences that can be

---

[2] Defendants' comparison to *Jysk Bed'n Linen* is therefore a strawman. Plaintiffs are not relying on a technicality. It is immaterial whether a domain registration expired, was deleted, and then re-registered, as in *Jysk Bed'n Linen*, or whether it was continually registered and renewed, as Defendants contend. What turned Defendants' conduct into cybersquatting was the abandonment of any legitimate use for the Empower Domain in favor of a bad faith intent to profit from association with Plaintiffs' EMPOWER Brand and EMPOWER Marks.

7

drawn from these renewals are not properly the subject of a motion to dismiss.

### iii.      The EMPOWER Marks were Distinctive at all Relevant Times

Like Defendants' intent, the distinctiveness of the EMPOWER Marks is an ongoing inquiry that "can be measured at the time of the most recent re-registration." *Am. Cruise Lines*, 2017 WL 3528606 at *13. The Complaint alleges that Plaintiffs "launched the EMPOWER Brand nationwide in the fall of 2014," and began releasing numerous financial products clearly labeled with the EMPOWER Marks, which in 2020 alone generated income in excess of $100 million. Dkt. 1 at ¶¶ 22, 26-27. Beginning in 2015, Plaintiffs "significantly increased their profile" through substantial investments in marketing and advertising, including: sponsorships of NFL teams, and PGA and LPGA athletes (*id.* at ¶¶ 28, 31); naming rights on sports stadiums and practice facilities (*id.* at ¶¶ 29-30); signage on its business buildings (*id.* at ¶ 34); marketing campaigns related to the Tokyo 2020 Olympic Games (*id.* at ¶ 32); and an extensive presence on social media (*id.* at ¶ 33).

These marketing and advertising campaign efforts prominently display the EMPOWER Marks to a national and international audience, who have come to identify the EMPOWER Marks with Plaintiffs. *Id.* at ¶ 65. Accordingly, Plaintiffs began receiving federal trademark registrations for the EMPOWER Marks starting in 2017 and have numerous pending applications. Dkt. 1 at ¶ 18(a)-(j). The federal registrations are themselves prima facie evidence of distinctiveness. *See, e.g., Georgia-Pacific Consumer Products LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011) (when marks are federally registered with the USPTO, there is a rebuttable presumption that the marks are valid and protectable); *see also*, *Am. Cruise Lines, Inc.*, 2017 WL 3528606 at *13 ("federal registration [] provides a prima facie case of distinctiveness.").

These well-plead facts sufficiently establish that Plaintiffs' EMPOWER Marks were distinctive during the time Defendants have been attempting to profit in bad faith from the association of the Empower Domain with the EMPOWER Brand and the EMPOWER Marks. *See*

*e.g.*, *Mackie v. Awtry*, 2016 WL 5391182, at \*3 (N.D. Ill. Sept. 27, 2016) (denying dismissal of the ACPA claim since plaintiffs had "explicitly allege[d] the name is distinctive, that customers identify it with Plaintiffs, and that they identify it with [their services]"); *Tory Burch*, 2012 WL 4581409 at \*4 (marks found distinctive to support an ACPA claim where they were "well-known [] worldwide, as evidenced by the extensive media coverage of the brand.").

Defendants' arguments to the contrary cannot be properly resolved at this stage of the proceedings. *Mackie*, 2016 WL 5391182, at \*3 (declining to resolve the issue of whether a mark was "sufficiently distinctive to be protectable" since it constituted "questions of fact"); *see also*, *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 776 (N.D. Ill. 2011) ("Where a particular mark falls within this hierarchy [of protectable marks] is a factual determination."). Whether the term "empower" is "principally a dictionary word" that can be entitled to protection is not something that can be addressed on a motion to dismiss. *See, e.g., Vulcan Golf, LLC v. Google Inc*., 552 F. Supp. 2d 752, 766 (N.D. Ill. 2008) ("The court is simply not willing to engage in such an inquiry [] at the motion to dismiss stage" over whether "the term 'vulcan' is too common"). Finally, statements made by Plaintiffs during prosecution of their trademark applications are not binding in these proceedings. *Davis v. Lost Intl. LLC*, 2013 WL 12137103, at \*5 (C.D. Cal. Apr. 8, 2013). If they are considered at all, it will be as part of the "evidentiary mix" presented to the finder of fact. *Charisma Brands, LLC v. AMDL Collections, Inc.*, 2019 WL 6331399, at \*5 (C.D. Cal. Sept. 3, 2019). "Whatever the effect of the prior statements, they are clearly not relevant at this stage of the case." *Id.*

### iv. *GoPets* is a Decision on Appeal from *Summary Judgment*, is Not Widely Followed, and is Distinguishable from This Case

Defendants ignore the broader caselaw landscape and rely heavily on an outlier decision from the Ninth Circuit, which, on an appeal from *summary judgment,* held that the re-registration

9

of a domain name was "not a registration within the meaning of § 1125(d)(1)." *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1032 (9th Cir. 2011). The Second, Third, and Eleventh Circuits also have considered the issue but held that the ACPA is not limited to initial registrations and includes subsequent renewals or "re-registrations." *See Jysk Bed'n Linen*, 810 F.3d at 777; *Schmidheiny*, 319 F.3d at 582; *Storey*, 347 F.3d at 386. District courts without controlling circuit precedent have also expressly declined to follow *GoPets* rationale. *See Prudential*, 2021 WL 2744526, at *11 ("[T]he Ninth Circuit's decision in *GoPets* is contrary to the plain text and statutory purpose of the ACPA"); *Xereas*, 933 F. Supp. 2d at 16 ("*GoPets* is not persuasive").[3]

   *GoPets* is also distinguishable because it was an appeal from summary judgment and it was apparently "undisputed that [the defendant] could have retained all of his rights to [the domain] indefinitely if he had maintained the registration of the domain name in his own name." *Id.* at 1031. In contrast, Plaintiffs—and most courts—do not agree that a party can retain rights in a domain for all time, regardless of how egregious the evidence of bad faith becomes. *See, e.g., Storey*, 347 F.3d at 386 ("If another party has trademark rights in a mark that is similar to the domain name, the domain-name registrant must use the name without a 'bad faith intent to profit,' to maintain its registration rights." (internal citations omitted)); *see also Am. Cruise Lines*, 2017 WL 3528606 at *13 (rejecting argument that because "the domain name was not registered by a new owner . . . the relevant registration is the original registration"). Under Defendants' interpretation, an owner of a domain name that is similar to a distinctive mark could begin using

---

[3] While some courts have cited *GoPets* for other purposes, only one case outside the Ninth Circuit has adopted its reasoning that the ACPA is limited to initial registrations. *See Mehdiyev v. Qatar Natl. Tourism Council*, 2021 WL 1291143, at *5-7 (D. Colo. Apr. 1, 2021). In that case, however, the domain owner was operating a legitimate travel booking website at the website in question. *Id.* at *1. In another case, the Western District of Texas acknowledged the holding in *GoPets* but stopped short of adopting it. *Villareal v. Saenz*, 2021 WL 1986831, at *8 (W.D. Tex. May 18, 2021) *R&R adopted* 2021 WL 4057570 (W.D. Tex. Aug. 4, 2021).

the domain to redirect traffic to a competitor or engage in fraudulent "phishing" schemes, but be immune from cybersquatting liability—an absurd result.

As other courts have recognized, the Ninth Circuit's analysis focused particularly—perhaps as a result of how the parties framed the issues in that case—on the alienability of rights in a domain name and the risk of ACPA liability based on periodic changes or renewals of registrations. *Compare GoPets*, 657 F.3d at 1030-32 *with Jysk Bed'n Linen*, 810 F.3d at 777-78 (explaining *GoPets*); *Prudential*, 2021 WL 2744526, at *11 (same). But as the Second Circuit has explained, "ACPA rights differ from traditional property rights in land." *Storey*, 347 F.3d at 374. They are subject to ongoing legal use of the domain name. *Id.* at 374, 378, 386; *see also Xereas*, 933 F. Supp. 2d at 16 ("The statute simply requires that a domain name registrant not register the domain name with a bad faith intent to profit. The ACPA's focus is on the transferee's bad faith intent to profit from re-registering a domain name, not on restricting the ability of a domain name owner to sell or transfer his property interest in the domain name to anyone he would prefer.")

Thus, as the district court opined in *Prudential*, the Ninth Circuit's concerns are "best addressed through the bad faith intent to profit inquiry," 2021 WL 2744527, which furthers Congress's intent in combatting cybersquatting while avoiding "utter chaos" about which Defendants worry. To hold otherwise "would be nonsensical" because it would "exempt the bad-faith re-registration of a domain name simply because the bad-faith behavior occurred during a noninitial registration, thereby allowing the exact behavior that Congress sought to prevent." *Jysk Bed'n Linen*, 810 F.3d at 778. Even the statute contemplates an initial registration made in good faith that turns into one of bad faith. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(III) (directing consideration of "the person's prior use . . . in connection with the bona fide offering of any goods or services"). Therefore, Defendants' motion to dismiss the ACPA claim should be denied.

**B.     Plaintiffs State a Claim for Trademark Infringement**

Claims for trademark infringement based on a domain name do not require the use of the website for the sale of any goods or services. To state a claim, Plaintiffs need only allege that they own a valid mark and that Defendants use of the mark is likely to cause confusion, or to cause mistake, or to deceive. *See, e.g.*, *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196 (9th Cir. 2009).

**i.     Plaintiffs Own Distinctive Marks**

As discussed above, Plaintiffs have sufficiently alleged that they own a valid mark. *See supra* at 8-9. To the extent Defendants argue the EMPOWER Marks are weak or not deserving of protection, these are factual issues that cannot be resolved on a motion to dismiss. *Mackie*, 2016 WL 5391182, at *3 (whether a mark was protectable constituted "questions of fact"); *see also Facebook*, 819 F. Supp. 2d at 776 (strength of mark "is a factual determination"); *Vulcan Golf*, 552 F. Supp. 2d at 766 (same). Defendants' arguments based on statements made during prosecution of the EMPOWER Marks do not make the issue determinable at this stage. *Davis*, 2013 WL 12137103 at *5 (observing statements made during prosecution of trademarks are not binding in subsequent proceedings). The strength of the Empower Marks has only increased over years of continuous use by Plaintiffs, backed by years of multi-million-dollar marketing campaigns. These are factual questions that cannot be determined now, and the statements during prosecution, viewed in a vacuum, "are clearly not relevant at this stage of the case." *Charisma Brands*, 2019 WL 6331399 at *5.

**ii.     Defendants Are Not Senior Users**

Defendants try to cast themselves as having "senior" rights in the use of "empower," but in doing so they ignore the fact that they abandoned whatever senior rights they may have had. Defendants no longer operate a business under the "Empower Geo" brand—indeed, one of their other domains (empowergeo.com) redirects to what appears to be their new brand "Spatial Point."

12

They intentionally abandoned that brand by no later than 2016, relinquishing any "senior" rights they may have had. *See, e.g., Specht v. Google Inc.*, 758 F. Supp. 2d 570, 588-95 (N.D. Ill. 2010) (finding alleged senior user of mark had abandoned its rights). Since then, Defendants' only use of "empower" has been to infringe Plaintiffs' rights by attempting to trade on the goodwill and value of the EMPOWER Brand and EMPOWER Marks.

### iii. Defendants Use the EMPOWER Marks

Contrary to Defendants' characterization of their claims, Plaintiffs are not alleging rights in the word "empower" in gross. Rather, the Complaint alleges that Defendants are using the EMPOWER Marks to market and sell the Empower Domain based on its similarity with the EMPOWER Brand and the EMPOWER Marks, including by identifying "Empower Retirement" as an organization targeted to acquire the Empower Domain. *See e.g.*, Dkt. 1 at ¶ 2 (Defendants have "been using the Empower Domain to market the sale of the Empower Domain") and ¶ 44 (Defendants "added Empower to the list of targets"); *see also, id.* at ¶¶ 42-43, 58, 65. This constitutes use in commerce sufficient to support a claim for trademark infringement. *See e.g.*, *FieldTurf, Inc. v. Triexe Mgmt. Grp., Inc.*, 2003 WL 22956000, at *2 (N.D. Ill. Dec. 11, 2003) (finding sufficient the allegation that "Defendants made commercial use of both [domains]"). Indeed, "'use' has been interpreted broadly [] involving the internet and domain names," and oftentimes a "definitive ruling on the 'use' issue" would require "fact-finding" that is not appropriate at the pleading stage. *Vulcan Golf, LLC*, 552 F. Supp. 2d at 769.

Defendants' claim that its "use of the Domain" does not fall within the scope of the Lanham Act contradicts the caselaw. Defendants' argument that the use of the Empower Domain must be "related to the Plaintiff's goods and service" is an overly narrow interpretation of the statute. *Slep-Tone Ent. Corp. v. Coyne*, 41 F. Supp. 3d 707, 714 (N.D. Ill. 2014) ("Nowhere does [the statute] specify that the advertised 'services' must be those of the plaintiff"); *see also People for the Ethical*

*Treatment of Animals v. Doughney*, 263 F.3d 359, 365 (4th Cir. 2001) (use of mark was "'in connection with' goods or services" when it prevented users from obtaining Plaintiffs' goods or services). Defendants admit that the Empower Domain is being used to market the Empower Domain for sale, dkt. 21 at 3, and that Plaintiffs' customers are frequently being misdirected to the Empower Domain. Dkt. 1 at ¶ 48. Thus, use of the Empower Domain to advertise the sale of that domain constitutes a "use in commerce" "in connection with [] goods" and falls within the scope of 15 U.S.C. § 1125(a).[4] *Intermatic Inc. v. Toeppen*, 947 F. Supp. 1227, 1239 (N.D. Ill. 1996) (in considering claim for trademark dilution, held that reselling a domain name "is sufficient to meet the 'commercial use' requirement of the Lanham Act"); *see also Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 831-32 (N.D. Ill. 2000) (collecting cases).

### iv.    Defendants' Use of the Empower Domain Causes Confusion

The Complaint alleges that not only have Defendants admitted the Empower Domain has caused actual confusion, but Defendants have sought to leverage this confusion to force a sale. Dkt. 1 at ¶ 48 ("Defendants have tried to leverage instances of actual confusion by Plaintiffs' customers, noting they receive 'phone calls every day' from Plaintiffs' customers 'with 401k questions' and receive 'numerous emails on a regular basis."). Indeed, Defendants may even be causing additional confusion by allowing misdirected emails to be delivered to them, rather than to be "bounced back" to the original sender as undeliverable.[5] These allegations of actual confusion are more than sufficient to satisfy the likelihood of confusion requirement. *See CAE, Inc. v. Clean*

---

[4] Defendants' reliance on Plaintiffs' allegation that the Empower Domain is not being used "in connection with even an arguable *bona fide* offering of goods or services" disregards the emphasized word—*bona fide*. *Compare* Dkt. 21 at 11 *with* Dkt. 1 at ¶¶ 2, 58, 65. Defendants are unquestionably using the Empower Domain in commerce, but for an improper purpose.

[5] A "bounce back" is an automated response that informs a sender that the message was not delivered. *See* Wikipedia, https://en.wikipedia.org/wiki/Bounce_message (Oct. 15, 2021).

*Air Eng'g, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001) ("[E]vidence of actual confusion, if available, is entitled to substantial weight in the likelihood of confusion analysis.").

Tellingly, Defendants do not address their own express and repeated admissions of actual confusion by Plaintiffs' customers. *See e.g.*, Dkt. 1 at ¶ 48. Instead, Defendants offer a cursory and conclusory likelihood of confusion analysis untethered to the Complaint, arguing Plaintiffs' customers "would not be likely to mistake a provider of retirement services with a 'domain for sale' page." Dkt. 21 at 12. At best, Defendants contest the well-plead facts regarding confusion, raising an issue not properly resolved at this stage. *Slep-Tone*, 41 F. Supp. 3d at 715 (likelihood of confusion is a fact-intensive inquiry that "ordinarily does not lend itself to a motion to dismiss").

Even were this Court to engage in a likelihood of confusion analysis, a consideration of the three factors often deemed "particularly important" weigh heavily in Plaintiffs' favor—"the similarity of the marks, the defendant's intent, and actual confusion." *CAE, Inc.,* 267 F.3d at 678. As set forth above, the Empower Domain incorporates exactly Plaintiffs' EMPOWER Marks. Dkt. 1 at ¶¶ 2, 18(a)-(j). Further, Defendants were expressly aware of Plaintiffs' EMPOWER Marks and expressly sought to trade on Plaintiffs' goodwill. *Id.* at ¶¶ 38-45, 50. Lastly, Defendants have admitted to numerous instances of actual confusion. *Id.* at ¶ 48. Consequently, the well-plead facts and Defendants' own admissions are sufficient at this stage to overcome the contention that confusion "would not be likely." Dkt. 21 at 12.

Therefore, Defendants' motion to dismiss the trademark infringement claim should be denied.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

15

Respectfully submitted,
By: /s/Mark T. Deming _____

Gary E. Hood (ARDC No. 6281580)
Mark T. Deming (ARDC No. 6299631)
Adam S. Weiss (ARDC No. 6256842)
POLSINELLI PC
150 N. Riverside Plaza
Suite 3000
Chicago, IL 60606
Telephone: (312) 819-1900
Facsimile: (312) 819-1910
ghood@polsinelli.com
mdeming@polsinelli.com
aweiss@polsinelli.com

*Attorney for Plaintiffs Great-West Life &
Annuity Insurance Company and
Empower Retirement, LLC*