**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY; EMPOWER RETIREMENT, LLC, <br><br>     Plaintiffs, <br><br>     v. <br><br>EMPOWER GEOGRAPHICS, INC.; ALEX MACHINIS, <br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.: 1:21-cv-04004<br><br>Hon. John Robert Blakey |

## DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

Any business has the basic right, upon winding up its operations, to advertise and sell its assets. Internet domain names are not some sort of business asset which must be surrendered upon the winding up of the business. Internet domain names are recognized as a valuable form of property. *See, e.g., Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003):

> Moreover, like other forms of property, domain names are valued, bought and sold, often for millions of dollars . . . and they are now even subject to in rem jurisdiction, see 15 U.S.C. § 1125(d)(2). . . . Registering a domain name is like staking a claim to a plot of land at the title office. It informs others that the domain name is the registrant's and no one else's.

Internet domain names, absent any ongoing business at all, can be seized and auctioned for their inherent value by a receiver to satisfy judgment liens (*see, e.g.*, *Office Depot Inc. v. Zuccarini*, 596 F.3d 696 (9th Cir. 2010)) and are often valuable assets fought over in bankruptcy (*see,* e.g., *Search Mkt. Direct, Inc. v. Jubber (In re* Paige*)*, 685 F.3d 1160 (10th Cir. 2012) (concerning whether the domain name "freecreditscore.com" was subject to liquidation by the trustee)). Ordinary dictionary words, many of which additionally function many times over as nationally

1

recognizable and distinctive brands such as Delta for airlines, faucets, tools, dental services and more by their respective owners, are valued precisely because, as principally dictionary words, they may have utility for a variety of purposes which such words may indicate. *Interstellar Starship Servs., Ltd. v. Epix, Inc.,* 304 F.3d 936, 942 n.5 (9th Cir. 2002); *In re* Ondova Ltd., Case No. 09-34784-SGJ-11, 2012 WL 5879147, at *8, *11 (Bankr. N.D. Tex. Nov. 21, 2012) (discussing the domain name secondary market and general price valuation methods for internet domain names at, *e.g.*, ¶¶ 21, 31-33).

The ordinary terminal stage of any legitimate business is the selling off of its valuable assets, and not simply the mere abandonment of them. The Defendants, in view of Mr. Machinis' advancing age and lack of immortality, are as entitled as any other business to decide when to sell the filing cabinets, copy machine, paper clips and, yes, the domain name into which years of hard work and goodwill were invested, and which was registered at a time when .com dictionary words were readily available. Had Defendants been operating a taxi business, it would be laughable to assert they somehow abandon legitimate title to their vehicles by parking them, putting "for sale" signs on them, and enlisting a broker to sell them, instead of continuing to transport passengers. That is all Defendants have effectively done with the domain name at issue here. The ACPA was not intended to grant any party, much less one with a junior non-exclusive claim to arbitrary use of a dictionary word, a "springing interest" in a legitimately registered and held domain name. The ACPA was also not intended to upend basic principles of trademark law embodied in decisions under the Federal Trademark Dilution Act, which was the less specific tool in the anti-cybersquatting kit prior to the ACPA. "Nothing in trademark law requires that title to domain names that incorporate trademarks or portions of trademarks be provided to trademark holders." *HQM, Ltd. v. Hatfield*, 71 F. Supp. 2d 500, 508 (D. Md. 1999)

2

(citing *Washington Speakers Bur., Inc. v. Leading Auth. Inc.*, 49 F. Supp. 2d 496, 498 (E.D. Va. 1999)). Indeed, "cyber" was pre-pended to the property concept of "squatting" as an analogy to persons physically occupying property already belonging to another, and not simply remaining on one's own property.

The Plaintiff argues this proceeding involves a "years-long campaign to create confusion". **The Defendants emphatically agree.** The Complaint details how the Plaintiff, knowing full well that the domain name was registered to Defendants, nonetheless launched an impressive years-long campaign to become known as one among many businesses calling itself "EMPOWER". The Plaintiff generated the confusion of which it complains, but blames it on the Defendants. The Plaintiffs brag that annually they "have spent more than $50 million in the United States alone to promote and advertise the EMPOWER Brand" annually (D.I. 27 at 2), since having made the foolhardy decision to adopt a brand it knew was already registered as a domain name. The Defendants, comprising a solely-owned geographic mapping company and its owner, are simply not able to hold a candle to the Plaintiff's massive $50M per year campaign of generating confusion. The Defendant is simply not engaged in such things as festooning athletic facilities of national renown with the word "EMPOWER". That is admitted in the Complaint to be the sole work of the Plaintiffs for which, like the Plaintiffs' sole choice of how to brand the subsidiary in 2014, the Defendant cannot plausibly be alleged to be responsible.

While it is indeed the job of a broker or salesperson in any field to use whatever persuasive means may be at their disposal—including appeals to fear—it is simply not the case that the car salesman's warning that one's older vehicle's brakes are unsafe imbues that salesman with the power to cause one to crash. One is the driver of one's own car, and responsible for one's own brakes. Likewise, Defendants in this proceeding have never had any ability to cause a

single consumer to send a misdirected email intended for the Plaintiffs or any other "EMPOWER" mark owner. That steering wheel has been firmly in the Plaintiffs' hands since the day the Plaintiffs knowingly and intentionally decided, in the universe of all possibilities, to press the pedal to the floor and brand itself identically to the Defendants' long-registered and legitimately held domain name. Continuing the analogy to property law, this is more a case of the Plaintiff "coming to the nuisance" of which it now complains, than one of "squatting" upon property to which one does not have lawful title.

On the facts alleged by Plaintiffs, Defendants hold a senior property interest in the domain name relative to the Plaintiffs' admitted junior trademark claim. As anticipated in the Motion to Dismiss (D.I. 21), the Plaintiff argues that *Schmidheiny* is regularly "followed" with the effect of re-setting the date of registration of a domain name in order to convert a junior trademark claim into a senior claim for the purpose of the ACPA's requirement that the mark be "distinctive at the time of registration". The Plaintiff urges a reading of the ACPA under which no senior registrant could maintain a domain name beyond the regular annual renewal payment, with no change of registrant or no other legal obligation to transfer the name, and the ACPA requirement that "a mark that is distinctive at the time of registration of the domain name" to simply mean "until the next perfunctory renewal fee is paid". The Plaintiff further suggests that *Schmidhein*y and *GoPets* are in opposition. But, as previously noted, *Schmidheiny* and *GoPets* addressed the timing of registration for two different purposes: (a) whether the ACPA applies to a pre-1999 domain name, and (b) whether perfunctory renewals by the same beneficial owner count as "re-registrations".

While the issues afoot in *Schmidheiny* and *GoPets* are often unnecessarily conflated, a close look at the chronological facts and outcomes under cases which the Plaintiffs argues to

have "followed Schmidheiny" is instructive.  The first thing that becomes clear upon factual review of these cases is a tendency to take some liberties with the term "re-registration", about which the Schmidheiny court declared held as "We hold that the word "registration" includes **a new contract at a different registrar and to a different registrant.**" *Schmidheiny v. Weber*, 319 F.3d 581, 583 (3d Cir. 2003).

Additionally, of the seven cases said to have "followed" *Schmidheiny*, there was no dispute that the mark at issue preceded the defendant's registration of the domain name.  *Jysk Bed'n Linen v. Dutta-Roy*, 810 F.3d 767, 771 (11th Cir. 2015), involved an actual lapse of the domain name from registration, and a re-registration by a party having a bad faith motivation to do so, where "[s]ince 1990, [plaintiff] has operated under the trade name and common-law trademark By Design.".  That plaintiff's trademark preceded defendant's acquisition of the domain name was a condition already satisfied in each of the cited *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 374 (2d Cir. 2003) (trademark registered in 1995, and domain name registered in 1997); *compare Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1238 (11th Cir. 2009) (domain name registered in 2000), *with* Ex. C (DIAMOND BRITE, Reg. No. 1,758,362 (registered to Southern Grouts & Mortars, Inc. on Mar. 16, 1993));[1] *Ownum, LLC v. Ownum, Inc.*, C.A. No. 19-1043-MN, 2020 WL 8882941, at *3 (D. Del. Apr. 17, 2020) ("In addition, the record demonstrates that plaintiff's mark was distinctive at the time defendant registered the ownum.com domain name at Tucows in February 2019"); *Heron Dev. Corp. v.*

---

[1] That 3M acquired DIAMOND BRITE trademarks from American Electronic Sign Company along with the domain name (*Southern Grouts*, 575 F.3d at 1238) is irrelevant because those acquired trademarks were registered in 1995 and thus junior to Southern Grout's trademark. Ex. C (DIAMOND BRITE, Reg. No. 1,929,071 (registered to American Electronic Sign Company Corp. on Oct. 24, 1995); DIAMOND BRITE, Reg. No. 1,942,026 (registered to American Electronic Sign Company Corp. on Dec. 19, 1995)).

*Vacation Tours, Inc.*, No. 16-20683-CIV-MORENO, 2018 WL 2943217, at *15 (S.D. Fla. June 12, 2018) ("[T]he [Plaintiff's] Palace Resorts marks qualified as distinctive when Defendants registered and used the infringing domain names."), *vacated on other grounds*, 814 F. App'x 468, 472 n.8 (11th Cir. 2020) (qualifying the *vacatur* of summary judgment insofar as "distinctiveness of the marks is not at issue in this appeal"); and, in particular, *Prudential Ins. Co. of Am. v. PRU.COM*, in which the "PRU" mark at issue long pre-dated the defendant's acquisition of the domain name from an unrelated party and which took great care to distinguish the facts of that case from *GoPets*, avoiding a false dichotomy between *Schmidheiny* and *GoPets*:

> **There,** [in GoPets] **an individual (Hise) registered a specific website in his own name and then re-registered the website in the name of a company owned by him and his brother.** *See id.* at 1027-28. **On these facts, the Ninth Circuit sensibly concluded that Hise was not a cybersquatter, given the minor, nominal change in ownership.** Hise effectively controlled the subject website both before and after the change in the registration, and that clearly was what mattered. *See id.* at 1030-31. The Ninth Circuit's decision is inapposite and does not apply to this case, where, contrary to *GoPets*, the initial registrant (an unidentified Texas Company) sold the domain name to SSN, an unrelated party. **Thus,** *GoPets* **is factually inapposite.**

*Prudential Ins. Co. of Am. v. PRU.COM,* No. 1:20-CV-450, 2021 WL 2744526, at *11 (E.D. Va. June 30, 2021) (emphasis added). *Prudential* does not somehow reject *GoPets*, but endorses it as sensible, and distinguishes it. Along similar lines, the cited *Xereas v. Heiss*, 933 F. Supp. 2d 1 (D.D.C. 2013) involved a transfer of a domain name to a party which then absconded with it after a mark had become distinctive:

> Dawson and Heiss removed Xereas from his management role and, without Xereas's knowledge or approval, instructed Squiid to revise the domain name registration information for "riotactcomedy.com" **to transfer ownership of the domain names to the LLC.**

*Xereas*, 933 F. Supp. 2d at 5 (emphasis added).

In none of these cases, said to have "followed" *Schmidheiny*, was the domain name at issue continuously registered to the same registrant for years senior to the mark in question and then, as Plaintiff urges here, was stripped of its relative seniority in the ownership of its property by the mere fact that an unrelated junior party decided to brand itself as such. All of the foregoing cases involved marks which were distinctive at the time the defendant party either registered them, acquired them from another party, or transferred them to deprive the lawful claimant of them.

Of the cases said to have followed *Schmidheiny*, only one comes arguably close to being an "outlier", and that is the remaining cited case of *Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co.,* No. 13-cv-324 (RGA), 2017 WL 3528606 (D. Del. Aug. 14, 2017). On the facts of that case, the quarreling parties appear to have started their businesses at around the same time, but eventually reached a settlement agreement as to their respective trademark rights. Defendant's renewal of the name and failure to surrender the name in spite of the existing legal duty of the settlement agreement was deemed to be a bad faith act of registration. *Am. Cruise Lines*, 2017 WL 3528606, at \*10, \*27 ("Plaintiff filed this suit alleging that Defendant breached the Settlement Agreement by failing to transfer the domain name and that Defendant was liable for cybersquatting. . . . Defendant's failure to surrender greatamericansteamboatcompany.com is also the basis for Plaintiff's cybersquatting claim."). Absent the existing legal obligation not to renew the domain name, but to transfer it consistent with the settlement agreement, *Am. Cruise Line*s simply does not stand for the proposition that every time a domain name is renewed by the same registrant, it is up for grabs by any covetous junior trademark claimant which might have arisen since the last renewal, and did not "follow Schmidheiny" for any such purpose.

The cases which are said to "follow" *Schmidheiny* involve either complete "re-registration" of a domain name, an originally-registered domain name that has been transferred or acquired in a "re-registration" by an unrelated party junior to the mark in question, or pre-existing contractual obligations among the parties. None of those cases is in actual "conflict" with the circumstances in *GoPets*, in which the domain name in question had simply been maintained by the same party in interest since well prior to the mark in question. Where these cases come into apparent conflict, is when a defending party attempts to claim priority by what amounts to "tacking" to a previous unrelated registrant. Unsurprisingly, in circumstances where a subsequent acquisition of a previously-registered domain name is motivated by a bad faith intent arising specifically from the mark in question, the cybersquatter's attempt to inequitably rely on *GoPets*, by claiming a cloak of priority from a previous and unrelated registrant, is rejected. Those rejections of bad faith invocations of *GoPets* are consistent with *Schmidheiny's* classification of registration to include registration "to a different registrant", as opposed to continued registration by the original registrant and its related entity. The Opposition does not cite a single case in which periodic renewals of a legitimately registered and used domain name, absent any existing duty to transfer the name due to prior dealings among the parties, or absent any intervening bad faith acquisition or transfer of the domain name by the defendant therein, were held to deprive a senior good faith domain registrant of the ability to dispose of its legitimately acquired business property on terms it finds agreeable. The mere citation of *Schmidheiny*, or incantation of a particular definition of the word "re-registration" unmoored from its case-specific definition, does not constitute "following Schmidheiny". No court applying *Schmidheiny* has reached such a result on facts such as presented here where the defendants present registration of the domain name occurred years prior and independently of a

rebranding decision by a Plaintiff. *Schmidheiny* does not miraculously transform the obvious and foreseeable consequences of Plaintiff's own recent poor decision making, in order to render the Defendant to be a wrongdoer, merely because Defendant seeks to sell property legitimately acquired and used for years in its business along with the desks, pencils and other assets at what rate the Defendant believes the market will bear.

The Defendants do not dispute that the Plaintiffs have rights in their mark which is presumptively distinctive for the narrow range of services among the crowded field of "EMPOWER" brands for their respective lines of goods and services. But no amount of chest-thumping about how much the Plaintiff is willing to spend on promoting "EMPOWER" renders the Plaintiff's mark to have been distinctive at the time the Defendant registered the domain name, nor deprives the Defendant of its senior property interest in the domain name as an asset used in the ordinary course of its legitimate business and now available for sale on the open market to any and all who might be interested in purchasing it for equally legitimate purposes. The ACPA simply has not been applied to deprive a senior legitimate registrant of a domain name in circumstances similar to those presented here, which most closely resemble the facts of *GoPets*, and which decision is itself not in conflict with any case in which *Schmidheiny* is said in the Opposition to have been followed.

Dated: October 29, 2021       Respectfully submitted,

                                          */s/ David P. Berten*
                                          David P. Berten (IL #6200898)
                                          Global IP Law Group, LLC
                                          55 W. Monroe St, Ste 3400
                                          Chicago, IL 60603
                                          Tel.: 312-241-1500
                                          dberten@giplg.com

John Berryhill, Ph.d. Esq. (admitted *pro hac vice*)
204 East Chester Pike
First Floor, Suite 3
Ridley Park, PA 19078
Tel.: 610-565-5601
john@johnberryhill.com

*Attorneys for Defendants Empower Geographics, Inc. and Alex Machinis*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will notify all attorneys of record of the filing of this document.

*/s/ David P. Berten*
David P. Berten
